**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MARK COX,

                      Plaintiff,

       -against-

GERMAN KITCHEN CENTER LLC,
GERMAN KITCHEN CENTER NEW YORK, LLC,
and MAYAN METZLER

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION AND</u>
<u>ORDER</u>

17 Civ. 6081 (GBD) (JW)

GEORGE B. DANIELS, United States District Judge:

Plaintiff Mark Cox commenced this action against Defendants Mayan Metzler ("Metzler"),
German Kitchen Center, LLC ("GKC"), and German Kitchen Center New York, LLC
("GKCNY") also known as Leicht NY, LLC ("Leicht") (together, "Defendants") for violations of
the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the New York Labor Law
("NYLL"), N.Y. Lab. Law. §§ 650 et seq., and for breach of contract. Plaintiff brings six claims
alleging that Defendants failed to pay him statutory minimum wages, overtime wages, and spread
of hours wages; failed to provide Plaintiff wage statements; and breached the contract between the
parties by failing to pay the total wages due. (*See* Am. Compl., ECF No. 19, at 4–9.) Defendants
assert two counterclaims for beach of contract and promissory estoppel related to an alleged
partnership agreement between the parties. (Defs.' Answer to Am. Compl. ("Defs.'
Counterclaims"), ECF No. 31, ¶¶ 71–80.) Following the completion of discovery, the parties
cross-moved for summary judgment with respect to all of Plaintiff's claims but not Defendants'
counterclaims. (Pl.'s Mot. Summ. J., ECF No. 85; Defs.' Mot. Summ. J., ECF No. 93.)
Defendants' motion is GRANTED to the extent of dismissing Plaintiff's labor claims, but

DENIED as to Plaintiff's contract claim.  Plaintiff's motion for summary judgment in his favor on his claims is DENIED.

## I.     FACTUAL BACKGROUND

Defendants'[1] business offered design services and kitchen components for the luxury kitchen market.  (*See* Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt."), ECF No. 93, ¶ 2) Defendants operated multiple showrooms in New York in which their representatives designed and sold kitchen components to clients.  The parties first became acquainted in 2013, when Plaintiff became a client and used Defendants' services to design and purchase a custom kitchen for Plaintiff's property in Florida.  (Decl. of Mark Cox, Attachment to Pl's. Notice of Mot. For Summ. J ("Cox Decl."), ECF No. 85-2, ¶ 5.)  Plaintiff preferred to buy the kitchen from a local showroom in Tampa, Florida instead of one of Defendants' New York showrooms, but Defendants did not yet have a Tampa location.  (Decl. of Mayan Metzler in Opp'n to Mot. For Summ. J. (Metzler Decl., Ex. F ("Cox Dep."), ECF No. 91, 71:8–14.)  Plaintiff was an architectural designer with 30 years' experience in design (*id.* at 12:9–11, 13:11–14:18) and intimated to Metzler that Tampa was a market Defendants could enter together.  (Cox Decl. ¶¶ 6-7.)  Plaintiff testified that he conveyed to Metzler that he "could sell [Defendants'] kitchen in Tampa" and that "[Defendants] need[ed] a showroom in Tampa." (Cox Dep. 71:12-16.)

Plaintiff fell on hard times shortly thereafter in 2014 and needed work.  (Cox Decl. ¶¶ 8–9.)  Plaintiff contacted Metzler near the end of summer that year seeking to work for the business, and Metzler agreed to hire Plaintiff.  (Cox Dep. 71:19–72:10.)  Defendants engaged Plaintiff's services on or around August 18, 2014 at a rate of $20 per hour, but the engagement did not have

---

[1] This Court denotes the applicable Defendant where discernable, but otherwise uses "Defendants" when the record is not clear as which defendant(s) is specifically implicated.

a specified duration and was not reduced to writing.  (Cox Decl. ¶¶ 11–12.)  During these initial conversations, Plaintiff and Metzler again discussed the potential for Plaintiff to sell Defendants' kitchens in Tampa, with Metzler expressing his "serious interest in a potential partnership with Plaintiff to open a new showroom in Florida" and discussing a potential "50-50 partnership."  (*Id.* at ¶ 64; Cox Dep. 72:3–4.)  This discussion sparked "a lot of conversations" between Plaintiff and Glenn Diestel, one of Defendants' representatives who was already a partner of Metzler's, including "what it was to be a partner . . . ."   (Cox Dep. 72:10–14.)  Plaintiff proceeded to incorporate his corporate entity, Mark Cox Designs, Inc., and claims he did so in anticipation "of forming a partnership for a Florida showroom . . . ."  (Cox Decl. ¶ 65.)

On August 22, 2014, Plaintiff first inquired about filling out tax–related and other paperwork, asking if he should meet with Metzler or another representative to fill out W–4–related paperwork.  (Cox Decl., Ex. C at 15.)  The topic again arose on August 26, when Plaintiff submitted the hours he recorded for the previous week's work via email, and Metzler responded asking if Plaintiff wanted a W-2 or 1099 designation.  (Cox Decl., Ex. D at 17.)  Plaintiff then had "numerous conversations" with Metzler and Plaintiff's accountant about the difference between the designations and which designation Plaintiff should elect.  (Cox Dep. 66:6–14.)  Plaintiff thereafter requested and obtained a 1099 designation (*id.* at 66:15–19) and filed tax returns consistent with this designation for 2015 through 2017.  (Metzler Decl., Ex. D, ECF Nos. 91–4, 91–5, 91–6.)  He also obtained a Federal Employer Identification number (Pierce Decl. in Support of Defs.' Mot. For Summ. J. ("Pierce Decl."), Ex. H, ECF No. 95–11) and a business bank account associated with Plaintiff's corporate entity.  (Cox Dep. 54:8–16.)

Plaintiff received all of his payments, except for the first payment, through his corporate entity.  (Cox Decl. ¶ 67; Metzler Decl., Ex. C.)  The process through which Plaintiff received

payment was the following: Plaintiff generated an invoice billing Leicht for work payable to Plaintiff's corporate entity, which included the number of hours worked (a number which Plaintiff alone created); Plaintiff provided this invoice to Defendants whenever Plaintiff so chose; and Leicht remitted payment via checks made payable to Plaintiff's corporate entity. (*See* Cox Dep. 54:1–15; Metzler Decl., Ex. 1; Cox Decl. ¶ 44.) At one point, Plaintiff attempted to unilaterally increase his hourly rate in an invoice to $25 per hour (and increased the amount due accordingly), but Metzler rejected Plaintiff's attempt to increase his pay. (Cox Dep. 93:12–94:4.) The record of invoices and payments before this Court contains one invoice dated January 06, 2016 ("Invoice #133") and evidence that Defendants effectuated the first payment to Plaintiff directly (dated September 16, 2014), and four payments thereafter to Plaintiff's corporate entity (dated December 4, 2014; October 19, November 10, and December 18 of 2015). (Metzler Decl., Exs. 1, C.)

The parties dispute Plaintiff's title while working for Defendants, but they do not dispute that Plaintiff provided at least some design and sales services for Defendants' business for at least some period of time, (*see* Pl.s' 56.1 Stmt. ¶ 16), and that Plaintiff received from Defendants business cards listing "Leicht New York" as the company and "Project Manager/Designer" as Plaintiff's title. (Cox Decl., Ex. B at 13.) Plaintiff worked in some of Defendants' different showrooms designing and selling kitchen components, in addition to working outside of Defendants' showrooms, including by meeting with clients in their homes. (*See* Cox Decl. ¶¶ 28, 30, 39.)

Plaintiff largely used his own equipment. For a little over a month at the beginning of Plaintiff's tenure, Defendants provided Plaintiff with a computer and a phone for work purposes. (Cox Decl. ¶ 50.) Plaintiff worked under Diestel at this time and received floor sales training. (Cox Dep. 44:22–25.) Their relationship turned sour during this period, resulting in Diestel firing

Plaintiff on October 25, 2014 and Plaintiff returning the work phone and computer. (Cox Decl. ¶¶ 26, 57.) Metzler rehired Plaintiff at some point shortly thereafter. (*Id.* at ¶ 27.) Plaintiff used his own equipment from that point forward. (*Id.* at ¶ 51.)

Plaintiff claimed in his deposition that "the job" and "the demand of the project" determined his hours, and that he had the liberty to "choose how to manage [projects] . . . ." (*Id.* at 50–52; *see also* Cox Decl. ¶ 33.) Plaintiff has acknowledged that he set his own schedule. (Cox Dep. 118:2–5.) When asked *who* determined his hours, he answered, "the workload, the kitchen, the client themselves, shipping, coordination, contractors," but did not mention any Defendant at all. (*Id.* at 49–50.) With respect to a tangible schedule, Plaintiff testified that Defendants' representative provided to him on a periodic basis a spreadsheet assigning him to a certain showroom on certain days, but he "didn't read it as a schedule" and the hours listed were "just the operating hours of the showrooms." (*Id.* at 53.) He did not "really know what the numbers were for." (*Id.*) However, Plaintiff's declaration states that "Defendants would regularly send work schedules to [him] and the other employees by email, which would reflect the showroom to which [they] were assigned along with the shift . . . ." (Cox Decl. ¶ 32.) Defendants counter that Plaintiff was only included to the extent "Plaintiff told Defendants the time and days he wanted to train and render his services," which "Defendants simply ratified or adopted" and "Plaintiff was never 'expected' to be in the showroom." (Metzler Opp. Decl. ¶¶ 32, 34.) Other notable characteristics of the parties' work relationship include: Defendants did not track Plaintiff's hours and instead relied on the number he provided (Pl's. Notice of Mot. Summ. J., Attachment 2 ("Pl.'s 56.1 Stmt."), ECF No. 85-2, ¶ 12.) Plaintiff was not on Defendants' payroll. Plaintiff did not clock in or out of any timeclock system. Defendants did not require Plaintiff to take lunch breaks. Defendants did not set a minimum or maximum time allotment for Plaintiff's hours. Defendants

did not provide Plaintiff any fringe benefits or healthcare. (Pl.'s Rule 56.1 Response to Defs.' 56.1 Stmt., ECF No. 102-1, ¶ 27.)

It is not clear when the parties' work relationship ended. Plaintiff claims he continued working for Defendants until April 23, 2017, and was not paid for a portion of his hours worked in 2015 or any hours worked in 2016 and 2017. (*See* Cox Decl. ¶ 34; Pl.'s Mem. of Law in Supp. of Mot. Summ. J. ("Pl's. Mem."), ECF No. 85-1, at 8–9.) In support of this assertion, Plaintiff offers a list of hours he created for purposes of this litigation. (*See* Cox Decl., Ex. J; Oral Arg. Tr. 35:3–36:6.) Notably, Plaintiff does not claim that he submitted any invoices requesting payment after January 6, 2016—invoices that, if submitted, would reflect the bulk of the wages he now seeks. Metzler claims that the relationship ended sometime in 2016, around the time that the parties' potential business venture and/or related negotiations ended. (*See* Metzler Dep. 68:5– 69:15.) Defendants appear to believe that Plaintiff ceased his work with Defendants no later than December 2016. (Compare *id. with* Defs.' Counterclaims ¶¶ 64–65.)

Defendants claim that the parties entered into an oral partnership pursuant to the venture, (Metzler's Am. Decl. in Support of Mot. Summ. J. ("Metzler Am. Decl."), ECF No. 97, ¶ 36), which Plaintiff disputes. (Pl.'s 56.1 Stmt. ¶ 19.) Defendants make several allegations related to this claim, including but not limited to: Plaintiff (1) "visited Tampa several times on behalf of the partnership" throughout 2015 to scout locations for a showroom, (2) in October 2015, confirmed the parties agreement "that the value of [Plaintiff's] time would be applied to [Plaintiff's] half of the partnership expenses," (3) expressed his continuing interest in the venture in October 2015 (and through at least October 31, 2016), which Metzler relied upon in executing a lease for a Tampa showroom during that same month, and (4) abandoned the venture sometime after October 2016, which resulted in at least $140,000 in losses attributable to lease payments and construction-

related plans for the showroom.   (Defs.' Counterclaims ¶¶ 36, 41–42, 62–63, 66.)   Plaintiff acknowledged in his sworn testimony that at least one of Defendants entered into a lease for the Tampa showroom.   (Cox Dep. 81:3–9, 83:2–5.)

The record does show that the parties' discussions concerning the venture and Tampa showroom intensified at some point between the end of 2015 and the beginning of 2016.   For example, there is evidence that in February 2016, the parties had email communications concerning a potential partnership agreement related to opening the showroom, which entailed discussing draft versions of the agreement, a "$100,000 equal contribution as seed capital," and Plaintiff's view based on a previous conversation that the parties "agree[d] that the Tampa showroom will be a 50-50 ownership . . . ."   (Cox Dep. 78:15–17, 80:16–19.)   The parties agree that the potential business venture was later modified to a franchise-based structure.   (*Id.* at 87:10–13; Metzler Dep. 68:13–16.)

## II.   **LEGAL STANDARD**

When parties cross-move for summary judgment, the Court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).   But "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (internal citations omitted).   Consequently, summary judgment is "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

7

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson*, 411 U.S. at 248).

The party opposing summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Marvel Characters, Inc.*, 310 F.3d at 286. To survive the motion, the opposing party must show a genuine issue of material fact exists. *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To this end, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . ." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, the opposing party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment. *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (citation omitted). Rather, the opposer must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013).

## III.   **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT DISMISSING PLAINTIFF'S LABOR CLAIMS**

The chief dispute between the parties is whether Plaintiff was Defendants' "employee" under the FLSA and NYLL, or is otherwise an independent contractor.[2] The relevant FLSA and NYLL protections only apply to "employee[s]," not independent contractors. *See, e.g., Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 139 (2d Cir. 2017); N.Y. Lab. L. § 651.

The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). "[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in economic reality rather than technical concepts, determined by reference not to isolated factors, but rather upon the circumstances of the whole activity." *Salem*, 854 F.3d at 140 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008)) (cleaned up).

Under the NYLL, "employee" is defined as "any individual employed or permitted to work by an employer." N.Y. Lab. Law § 651(5). The NYLL, however, focuses more on the "degree of control exercised by the [putative] employer over the results produced or the means used to achieve the results" instead of the economic realities of the whole activity. *See Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 79 (2d Cir. 2020) (summary order) (quoting *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003)). Nonetheless, "[t]here is general support for giving [the definition of 'employee' under both statutes] consistent interpretations and there appears to never have been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL

---

[2] The parties agree that Defendants constitute an "employer" under the relevant statutes. (*See* Defs.' 56.1 Stmt. ¶ 1; Pl's. 56.1 Stmt. ¶ 1.)

(or vice versa)." *Ivanov v. Builderdome, Inc.*, 2021 WL 2554620, 2021 U.S. Dist. LEXIS 116250, at *12 (S.D.N.Y. June 22, 2021).

## A.     The Economic Reality Is That Plaintiff Was An Independent Contractor

The Second Circuit has developed the "economic reality" test to help guide courts in determining an individual's status as either an employee or an independent contractor under the FLSA. *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). The economic reality test comprises five factors:

(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

*Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008).  However, "[n]o one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Brock v. Superior Care*, Inc. 840 F.2d 1054, 1058–59 (2d Cir. 1988) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

### 1.     Degree of Control

This factor favors independent contractor status, which Plaintiff acknowledges is "crucial" to this inquiry. (Pl.'s Mem. at 5 (first citing *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984); then citing *Gustafson v. Bell Atlantic Corp.*,171 F.Supp.2d 311, 324 (S.D.N.Y.

2001)).) The record reflects that Plaintiff essentially worked when he so pleased and on terms consistent with an independent contractor.

Plaintiff testified that he set his own schedule, (Cox Dep. 118:2–5), and did not work pursuant to specific hours mandated by Defendants; rather, he determined his own hours according to his perception of "the demand of the project" and had the liberty to "choose how to manage [projects] . . . ." (Cox Dep. 50:21–52:11; *see also* Cox Decl. at ¶ 33.) When asked how his hours were determined, Plaintiff mentioned several different factors, including the workload, clients, and shipping, but left out Defendants' determination entirely. (Cox Dep. 49:18–50:9.) Plaintiff argues, in contradiction to his testimony, that he did not control when and how long he worked because Defendants "established a schedule" requiring Plaintiff to either be present in a certain showroom or "to notify Defendants if he would not be present." (Pl.'s Mem. at 5.) Plaintiff does not provide a copy of such a schedule, but offers a notification he sent Defendants (before having worked any hours) of his upcoming absence during his first week of work. (Cox Decl., Exs. J, H.) Moreover, Plaintiff's prepared list of hours worked goes well beyond the hours the showroom was open. Plaintiff also offers as support a suggestion from one of his co-workers to Metzler that Plaintiff work at a different location for the day. That employee stated, "I forgot to add to our meeting today that I think it would be good if [Plaintiff] can join me for the flemming Nielsen project." (Cox Decl., Ex. I; Pl.'s Mem. at 5.) Even in accepting that Plaintiff was scheduled to report to a specific showroom, "even independent contractors are required to keep to a schedule. The fact that an independent contractor is required to be at a job at a certain time does not eliminate his status as an independent contractor." *Sellers v. Royal Bank of Can.*, 2014 WL 104682, 2014 U.S. Dist. LEXIS 4563, at *17–18 (S.D.N.Y. Jan. 8, 2014).

This similarly applies to Plaintiff's argument that because the work entailed scheduling and attending appointments with customers, these components of the position militate toward

employee status, claiming Defendants and the work itself determined Plaintiff's hours. (*See* Pl.'s Mem. at 5.) But Plaintiff fails to articulate how Defendants are independently responsible for these inherent aspects of the work. Hence, it was "the very nature of [P]laintiff's work that obliged him" to meet these demands (not Defendants), (*Sellers*, 2014 WL 104682, 2014 U.S. Dist. LEXIS 4563, at *18) (citation omitted)), and such demands are not indicative of employee status. *See Franze*, 826 F. App'x at 77 (finding that schedule flexibility and lack of minimum-hour requirement supported independent contractor status notwithstanding "designated pickup and delivery times based on [defendant's] warehouse hours and customer requirements").

Plaintiff does not dispute that Defendants did not require him to clock in or out, did not mandate that he take lunch breaks, and did not set a minimum or maximum time allotment for work hours. Plaintiff also concedes that he was not subject to a non-compete agreement or any related form of restriction and that he was free to take vacations whenever he wanted. In sum, the record reflects that Plaintiff "worked at his own convenience." *See Sellers*, 2014 WL 104682, 2014 U.S. Dist. LEXIS 4563, at *17 ("Plaintiff worked 'at his own convenience': he was not required to arrive or depart the office at any particular time, take lunch or rest breaks for prescribed time periods, or clock in or out. . . . He took vacation and personal days at his own convenience and wrote emails announcing his planned days off . . . ." (citing *Bynog*, 1 N.Y.3d at 193) (cleaned up)).

In response to these indicia of a lack of employer control, Plaintiff argues that Defendants exercised control by subjecting Plaintiff's designs to an approval process and that Metzler had the exclusive power to dictate Plaintiff's rate of pay. An approval process may show Defendants exerted some level of control, but it is not clear that this process was exclusively for employees and not independent contractors—a quality control process can apply to all, especially for client-

based custom designs in a luxury market. *See generally, Jean-Louis v. Metro. Cable Communs., Inc.*, 838 F. Supp. 2d 111, 127 (S.D.N.Y. 2011) (finding that a quality control process does not show that the defendant "controls the day-to-day manner in which [workers] provide that service"). As for Metzler's power over Plaintiff's wages, the instance where Plaintiff unilaterally attempted to bill $25 per hour instead of the agreed-upon $20 rate shows the opposite. An employee ordinarily does not have the ability to bill his employer a new pay rate when he so wishes, but an independent contractor may.

## 2.   Opportunity for Profit or Loss and Investment in the Business

Courts should also "take into account whether the business relationship had an exclusive nature that limited the purported employee's opportunity for profit from other sources of work." *Kinney v. Artist & Brand Agency LLC*, 2015 WL 10714080, 2015 U.S. Dist. LEXIS 160465, at *52 (S.D.N.Y. Nov. 24, 2015.) Plaintiff was not under any exclusivity, and in one instance he earned remuneration for architectural plans he created and sold to one of the Defendant's customers with Defendants' consent. (Cox Decl. ¶¶ 70–71.)

What ultimately tips the scales toward independent contractor status is the parties' plan to form a partnership or joint venture and their actions in furtherance thereof. The plan entailed Plaintiff investing in Defendants' business by making a capital investment and potentially operating a new showroom in Tampa. The discussions underlying the plan commenced at the beginning of the parties' work relationship in 2014 and ended no earlier than February 2016. (Cox Dep. 71:8–72:4,76:2–18.) Even when accepting Plaintiff's claim that he did not ultimately invest in Defendants' business, he still incorporated his entity at the outset "for the anticipated purpose of a future joint venture with Defendants," (Pl's. Mem. at 6), the parties had numerous discussions on forming a partnership, (Cox Dep. 73:9–15), Plaintiff researched Tampa locations for a

showroom and traveled with Metzler to view these different sites, (*id.* at 89:4–11), and the parties even negotiated terms of a prospective partnership, including that each "would put up $100,000 to open a showroom." (*Id.* at 80:12–24.) These extensive conversations, efforts, and Plaintiff's opportunity for investment reflect independent contractor status.

### 3. Degree of Skill and Independent Initiative Required to Perform the Work

This factor favors independent contractor status. Plaintiff offers one sentence on this factor, arguing that the kitchen design work at issue "required no specialized skill or initiative . . . ." (Pl.'s Mem. at 8.) However, "specialized" skill is not the relevant criterion. The undisputed facts show that the work required considerable skill—Plaintiff was hired to design luxury, custom kitchens for customers, which required learning specific design software and initiative to sell the kitchens. (*See* Cox Dep. at 25–26 (explaining that he had "to learn how to use the software," that "kitchens are the most expensive and important part of a person's home," that "design was part of [his] skill set," and in order "to sell a kitchen [to a client] you have to provide something for them to love, to touch, to see").) Plaintiff was an architectural designer with 30 years' experience in design. But because "the fact that workers are skilled is not itself indicative of independent contractor status," this Court gives only a small edge to independent contractor status. *Brock.*, 840 F.2d at 1060–61.

### 4. Permanence or Duration of the Relationship

"[T]ransient" workers who "typically work for several employers" are more like independent contractors than employees. *Id.* at 1060. None of the parties submitted evidence that Plaintiff worked for another employer although he was not precluded from doing so. Nor did Plaintiff have a fixed employment period. *See Saleem*, 52 F. Supp. 3d at 142 ("Generally speaking,

14

independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration.") However, Plaintiff worked for months without pay or even submitting any invoices to Defendants.[3] Consequently, this context detracts from any inference of regular employee status.

### 5.     Integral Part of the Employer's Business

This factor only slightly weighs in favor of employee status. Defendants incorrectly focus on the extent to which *Plaintiff* was an integral part of Defendants' business. The analysis is instead centered on the *work* Plaintiff performed, and whether such work is integral to Defendants' business. No reasonable jury could find that a firm that designs and sells kitchens does not have as an integral part of its business the work of designing and selling the kitchens. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 921 (S.D.N.Y. 2013) ("No reasonable jury could conclude that exotic dancers were not integral to the success of a club that marketed itself as a club for exotic dancers.") However, there is no specific evidence that Plaintiff was a regular employee who worked or produced product on a regular basis.

### 6.     The Totality of the Circumstances

In addition to the five factors under the economic reality test, a court may consider the "totality of the circumstances." *Brock*, 840 F.2d at 1059. Plaintiff's 1099 tax status, the parties' plan to create a partnership, Plaintiff's own control of his work schedule, and the mechanics of

---

[3] Plaintiff contends that he worked for Defendants from August 18, 2014 through April 23, 2017. Defendants claim that the relationship with Plaintiff ended no later than December of 2016. However, Plaintiff's last invoice is dated January 6, 2016 and his last payment was received on December 18, 2015. Moreover, there is no evidence of what work Plaintiff performed during the disputed time period.

how Plaintiff was irregularly paid are just some of the glaring facts showing Plaintiff was an independent contractor.

It is undisputed that when presented with the choice of a W-2 or 1099 designation in 2014, Plaintiff conferred with his accountant and ultimately requested 1099 status. (Cox Dep. 66:6–14.) Around the time of that decision, Plaintiff and Metzler discussed a potential partnership in which Plaintiff would invest in Defendants' business and become part owner of a new showroom they planned to open together in Tampa. (Cox Decl. ¶ 64; Cox Dep. at 72:3–4.) Plaintiff incorporated a limited liability company to correspond with his 1099 tax status, and with the objective "of forming a partnership [with Defendants] for a Florida showroom." (Cox Decl. ¶ 65.) Plaintiff obtained a federal Employment Identification Number and proceeded to open a bank account in his corporate entity's name. (Cox Dep. 54:8–16.)   Moreover, Plaintiff does not dispute that he was not on Defendants' payroll as was typical for employees, and was paid on an infrequent basis with apparently multiple monthslong gaps between payments. (*See* Metzler Decl., Ex. C.) In fact, the process by which Plaintiff received payment was wholly inconsistent with that of an employee. Plaintiff generated an invoice on behalf of his corporate entity which included the number of hours he decided to work. He provided the invoice to Defendants for payment whenever he so chose, and Leicht would effectuate payment to Plaintiff's corporate entity in accordance with the invoice. (*See* Cox Dep. 54:1–15; Metzler Decl., Ex. 1; Cox Decl. ¶ 44.) Defendants did not determine how often Plaintiff could submit invoices for payment or even track or verify his hours. (Pl's. 56.1 Stmt. ¶ 12.) Defendants did not provide Plaintiff fringe benefits, insurance, or reimbursement for expenses. (Am. Metzler Opp. Decl. ¶ 14.) Finally, Plaintiff alleges that he worked from January 2016 through approximately April 2017 (nearly sixteen months) with no pay and has not offered underlying invoices submitted during this time period. (*See* Pl's. Mem. At 8–9.) It defies logic

for any minimum wage employee with only one job—especially a professional with 30 years' experience—to work for that long without pay, and to not adhere to an established, periodic method by which he received payment.

Plaintiff received the tax treatment and benefits of an independent contractor. Plaintiff forewent receipt of regular pay and benefits extended to employees, as an independent contractor would. Plaintiff created a system to receive payments in the manner of a *sophisticated* independent contractor. Plaintiff exclusively determined the number of hours he reported to Defendants in requesting payment, as an independent contractor would. Plaintiff incorporated his entity to receive his compensation and to form a partnership with Defendants, and engaged in negotiations as if he were an independent contractor.

Plaintiff claims that his incorporation, payment of wages by Leicht to Plaintiff's corporate entity, and 1099 tax status are of no consequence. (Oral Arg. Tr. 25:24–26:7.) Specifically, he relied on *Gustafson v. Bell Atlantic Corp.*, 171 F. Supp. 2d 311 (S.D.N.Y. 2001) at oral argument to argue that incorporation, and receiving wages through a corporate entity, is "irrelevant where the economic realities revealed that [a putative employee is] an employee." (*Id.* at 26.) He states in his papers, "The district court in *Gustafson* relied on palpably similar circumstances when it found that there was an employment relationship notwithstanding the plaintiff's operation under a corporate entity." Furthermore, he claimed that tax status has been "held by the Second Circuit to be irrelevant in the analysis." (Oral Arg. Tr. 32:16–21.)

Plaintiff conveniently distorts *Gustafson*, and misstates the case law in this District. *Gustafson* made clear that the plaintiff's limited liability company "was incorporated *only because this was a necessary pre-condition to working for the company*," as "he would not otherwise have been able to drive for the [c]ompany." *Gustafson*, 171 F. Supp. 2d at 325 (emphasis added). That

is not the circumstance here. Plaintiff was under no such obligation and was free to choose W-2 employment status. While not dispositive, tax status is far from irrelevant. The law in this Circuit states that electing 1099 status does "tend to show that Plaintiff understood himself to be an independent contractor and sought to obtain the financial advantages of that characterization when filing his tax returns." *Kinney*, 2015 WL 10714080, 2015 U.S. Dist. LEXIS 160465, at *62 (S.D.N.Y. Nov. 24, 2015); *see also Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 540 (S.D.N.Y. 2014) ("[T]he fact that Plaintiffs classified themselves as independent contractors on their tax returns and took business deductions certainly weighs in favor of independent contractor status . . . ."), *aff'd*, 854 F.3d 131 (2d Cir. 2017).

Plaintiff was an independent contractor under the FLSA, and has failed to raise a genuine issue of material fact such that any reasonable jury could return a FLSA verdict in his favor as Defendants' employee.

## B.    Plaintiff Was An Independent Contractor Under The NYLL

This Court reaches the same result under the NYLL. Although slightly different, the NYLL's test lends itself to a more straightforward application and has already been addressed.

The NYLL provides the same definition for "employee" as the FLSA. *See* N.Y. Lab. L. § 651. The inquiry is similar to that called for under the FLSA, but a different set of factors apply for NYLL claims: "(1) whether the worker worked at her own convenience; (2) was free to engage in other employment; (3) received fringe benefits; (4) was on the employer's payroll; and (5) was on a fixed schedule." *Ivanov v. Builderdome, Inc.*, 2021 WL 2554620, 2021 U.S. Dist. LEXIS 116250, at *42 (S.D.N.Y. June 22, 2021) (citing *Hart*, 967 F. Supp. 2d at 924). Moreover, the NYLL's North Star differs as well: "the critical inquiry in determining whether an employment relationship exists under the NYLL pertains to the degree of control exercised by the purported

employer over the results produced or the means used to achieve the results." *Franze*, 826 F. App'x at 79 (quoting *Bynog*, 1 N.Y.3d at 198). This Court has already addressed each of these factors, and determined that Defendants exercised a degree of control over Plaintiff consistent with an independent contractor, not an employee. To reiterate, Plaintiff set his own schedule; was free to engage in other employment; did not receive fringe benefits; was not on any Defendant's payroll; and was on a limited-fixed schedule, *i.e.*, he was scheduled to work certain showrooms on certain days. Accordingly, Plaintiff was an independent contractor for NYLL purposes, and his NYLL and Wage Theft Prevention Act claims under Count Five are dismissed.

## IV. NEITHER SIDE IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONTRACT CLAIM

Each side seeks summary judgment in its favor on Plaintiff's contract claim. None of the parties are entitled to summary judgment on Plaintiff's contract claim, as multiple issues of material fact remain for a jury to decide.

The elements of a breach of contract claim under New York state law are: "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orchard Hill Master Fund Ltd. v. SBA Communs. Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015)).

There is no dispute that some contract existed between the parties, but there is a dispute as to its terms. The parties agreed upfront that Defendants would compensate Plaintiff \$20 for each hour that he worked, and do not dispute that Plaintiff worked in 2014, 2015, and at least through some portion of 2016. There is no dispute Defendants effectuated payments amounting to \$10,890 for 2014 and \$36,682.00 for 2015 as part of their obligation under the contract, but did not effectuate any payments for any time worked in 2016 or 2017. This necessarily means that the

parties do not dispute that, pursuant to a contract between them, Plaintiff worked some number of hours in 2016 for which he did not receive direct renumeration.

However, a genuine dispute of material fact exists as to the terms of the agreement between the parties. Defendants' theory is that the parties agreed to modify Defendants' obligation to pay Plaintiff $20 per hour such that Defendants would credit Plaintiff's payments owed for work completed against the amount Plaintiff agreed to supply toward their partnership. (*Compare* Metzler Dep. 32:9–14 ("[A]t some point, we agreed that because he said he didn't have money to make the 50 percent of the investment, so we agreed that he's going to accumulate whatever the hours are [that Plaintiff worked] towards the 50 percent of his investment."), *with* Defs.' Counterclaims ¶ 73(g) ("The following terms governed the partnership agreement: . . . The value of [Plaintiff's] independent contractor work as a project manager would count toward [Plaintiff's] half of the partnership obligations.").) Plaintiff contends that no such partnership agreement or agreement to alter Plaintiff's compensation occurred; rather, Defendants simply failed to pay him in accordance with their sole, original contract.

Another dispute of material fact appropriate for a jury is the number of hours Plaintiff worked. Plaintiff alleges that he is owed compensation for unpaid hours worked in each year from 2014 through 2017, (Pl.'s Mem. at 8–9), while Defendants contend that the hours Plaintiff alleges are impossible because, if true, he would have worked "more hours than the showroom was open in 60% of the 132 weeks he worked." (Defs.' Mem. at 6.)

Defendants argue in support of their motion that Plaintiff has not sufficiently alleged a contract claim. Specifically, Defendants maintain that Plaintiff has failed to demonstrate the first element of his breach-of-contract claim, arguing that Plaintiff has not established "that there was mutuality among the parties concerning the purported agreement's essential terms." (Defs.' Mem. at 24 (citing *Stein v. Guardsmark, LLC*, 2013 WL 3809463, 2013 U.S. Dist. LEXIS 103131, at

*39 (S.D.N.Y. July 23, 2013).) Summary judgment must be granted when the opposing party fails

to make "a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *N. Shipping Funds I, L.L.C. v. Icon*

*Capital Corp.*, 998 F. Supp. 2d 301, 316–17 (S.D.N.Y. 2014) (quoting *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986)) (internal quotation marks omitted). The formation of a contract requires

mutuality, also referred to as a "meeting of the minds," which is "a manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all material

terms." *Khurana v. Wahed Invest, LLC*, 2019 WL 1430433, 2019 U.S. Dist. LEXIS 31554, at *22

(S.D.N.Y. Feb. 26, 2019) (quoting *Express Indus. & Terminal Corp. v. New York State Dep't of*

*Transp.*, 93 N.Y.2d 584, 589, 715 N.E.2d 1050, 1053 (1999)).

Defendants' reliance on *Stein* is unavailing. There, the plaintiff took issue with how the

defendants calculated her overtime pay, claiming that their standard fluctuating-work-week

method improperly reduced her overtime pay in breach of "some sort of implied-in-fact contract

governing overtime." *Stein,* 2013 WL 3809463, 2013 U.S. Dist. LEXIS 103131, at *38, *41. In

dismissing the plaintiff's claim, the court highlighted that "no evidence supports the conclusion

that [the defendants] w[ere] also under th[e] impression" that they would pay plaintiff an overtime

rate that departed from their standard practice. *Id.* at *40. Here, Plaintiff's claim does not invoke

any such ancillary, implied-in-fact contract to which Defendants did not agree. Plaintiff's claim

instead goes to the heart of the parties' relationship, which the record fully supports:  Defendants

hired Plaintiff to work for their business at a rate of $20 an hour; Plaintiff indeed worked for their

business; and Defendants effectuated more than $46,000 of payments for his work from September

2014 through 2015, but did not do so thereafter.[4] Plaintiff has indeed established mutuality sufficient to raise a triable issue of fact.

In any event, the proffered evidence sets forth facts sufficient to establish Plaintiff's prima facie case, including the formation of the contract and the parties thereto, (Cox Decl. ¶ 10, 12, Exs. B, D; Metzler Dep. 27:12–28:6), the parties' obligations under the contract, (Cox Decl. ¶¶ 11–12, 28; Metzler Dep. 31:13–17; Am. Compl. ¶¶ 10–11, 50), Plaintiff's performance, (*see, e.g.,* Cox Decl. ¶ 28, Ex. J; Cox Dep. 11:17–20), Defendants' alleged breach, (Cox Decl. ¶ 47), and the resulting damages, (*id.* ¶ 47, Ex. J.)

## V. CONCLUSION

Defendants' motion for summary judgment is GRANTED dismissing Plaintiff's labor claims, and DENIED as to Plaintiff's contract claim. Plaintiff's cross-motion for summary judgment is DENIED. The Clerk of Court is directed to close the open motions at ECF Nos. 85 and 93 accordingly.

Dated: December 12, 2023
     New York, New York

SO ORDERED.

*George B. Daniel*

GEORGE B. DANIELS
United States District Judge

---

[4] In addition to mutuality, Defendants point to Plaintiff's "fail[ure] to state where the agreement was formed, whether it was written or oral, or the parties' duties and rights thereunder" as fatal deficiencies. (Defs. Mem. at 24 (citing *Sud v. Sud*, 211 A.D.3d 423, 424 (1st Dep't 1995).) Of these alleged deficiencies, the absence of whether the contract was in fact, written, or oral is the only credible argument, albeit to a limited degree. *See e.g., Caniglia v. Chi. Tribune-New York News Syndicate*, 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 (1st Dep't 1994). It would be inappropriate to dismiss Plaintiff's contract claim on this ground. To do so would put form over substance, allowing Defendants to sidestep potential liability when they concede on the one hand that "the evidence overwhelmingly supports . . . [that Plaintiff] work[ed] with and for Defendants as an independent contractor," but on the other contradict themselves and say that no mutuality existed. (Defs.' Mem. at 4, 24; *see also* Metzler Dep. 27:12–15 ("At some point, you and Mr. Cox began working together. Is that safe to say? A. Yes.") Moreover, it is clear from the record that this was an oral contract; for example, both Plaintiff and Metzler testified in their depositions that Metzler hired Plaintiff pursuant to an agreement formed in the conversation(s) between them. (Metzler Dep. 27:12–28:6; Cox Dep. 34:23–10.)